## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

Brian Teed and Marcus Clay, on behalf of themselves and all others similarly situated,

                Plaintiffs,

   vs.

Thomas & Betts Power Solutions, LLC,

                Defendant.

Case No. 08-cv-303-bcc

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DECERTIFY COLLECTIVE ACTION AND DISMISS OPT-IN PLAINTIFFS**

## INTRODUCTION

This wage and hour action nears the end of the pretrial discovery period following the substitution of Defendant Thomas & Betts Power Solutions, LLC ("TBPS") as a "party defendant" and successor to the potential overtime liability of former defendants JT Packard & Associates, Inc., and S.R. Bray Corp.  TBPS has now had an opportunity to depose the Plaintiffs and other Field Engineers who have joined this litigation, and to inquire into the nature and scope of the overtime claims arising out of their employment with J.T. Packard & Associates – their statutory "employer" whose assets TBPS purchased out of receivership in 2010.   In consideration of this Court's "ongoing obligation" to monitor the propriety of class certification in light of factual developments, *see Espenscheid v. DirectSat USA, LLC*, 2011 U.S. Dist. LEXIS 56062, *13 (W.D. Wis., May 23, 2011), TBPS now moves this Court to decertify this proposed collective class and dismiss the "opt-in plaintiffs" who have filed consent to join this lawsuit pursuant to

29 U.S.C. § 216(b).  This case can only proceed on the claims of the named plaintiffs alone.

The discovery record establishes that Plaintiffs Brian Teed and Marcus Clay cannot prove that they are similarly situated to one another regarding their work experience as Field Engineers.  They offer dramatically divergent evidence in support of their individual claims for unpaid overtime.  Teed acknowledges that JT Packard's records may legitimately reflect that there were many weeks when he worked less than ten hours in a week, and he has no realistic way of estimating the number of hours he worked at home engaged in activity that would not be reflected in his Field Service Reports, or "FSRs."  He guesses that he spent 15 to 45 minutes a day reviewing email, two hours a month reviewing manuals, and ten minutes in the morning loading his vehicle with equipment.

Clay, on the other hand, categorically rejects the FSRs as an accurate reflection of his working time.  If JT Packard's records indicated that he worked less than 40 hours, he insists that sufficient hours should be added to reach 40 every week, plus an additional 10 to 15 hours a week in overtime hours.  Teed testified that he spent two hours per month "reading manuals," but Clay testified that he spent **ten hours per week** engaged in work-related "research" at home.  Every day, according to Clay, he spent between 30 minutes and an hour reviewing email, and another hour-and-a-half to two hours on the telephone with managers, schedulers, and customers.

Both Clay and Teed concede that they have no basis for knowing how much time any other Field Engineers spent engaged in work-related activity that would not be

reflected in the FSRs.  Indeed, the actual testimony from the opt-in plaintiffs compounds the complexity of this case and offers even more diversity of experience and evidentiary disparity.  Some claimants stated that they always completed their paperwork on-site, and therefore, this administrative time would be reflected in the FSRs.  Others testified that they always completed these forms at home.  Some testified that they spent many hours a week performing "tech support," conferencing with other Field Engineers regarding repair questions or technical problems.  For others, this was a rare experience.  Some kept their tools in their vehicles, others spent hours per week loading and unloading equipment.  Quite simply, this record reflects an endless variety of personal work experiences.

A collective action presumes that evidence of a common policy or practice, disputed or conceded, will effectively yield a "common answer" that resolves all claims presented by every member of the class.  Here, the claimants offer extraordinarily diverse testimony regarding whether TBPS's records accurately reflect each claimant's hours worked, and when, how, and under what circumstances each claimant performed other various duties that he personally considered to be "work," and for which he now seeks overtime compensation.  Because the evidence in support of an alleged statutory violation cannot be presented on a representational basis, the Court has no option consistent with the due process rights of *all* parties but to decertify the class.

## PROCEDURAL AND FACTUAL BACKGROUND

### I.   THE PARTIES TO THIS LITIGATION AND PROCEDURAL HISTORY

This wage and hour collective action consolidates two separate lawsuits, *Teed v.*

*JT Packard & Associates, Inc.*, Case No. 3:08-cv-303 (W.D. Wis.), filed on May 28, 2008, and *Clay v. JT Packard & Associates, Inc.*, Case No. 3:09-cv-313 (W.D. Wis.), filed approximately one year later on May 19, 2009.  In his original pleading, Plaintiff Brian Teed alleged overtime claims under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, on his own behalf and on behalf of others "similarly situated," pursuant to 29 U.S.C. § 216(b).[1]  *See* Complaint (*Teed* Dkt. # 1).

According to his pleadings, Teed was employed by JT Packard & Associates, Inc. ("Old JT Packard"),[2] a company that serviced network-critical power equipment, as a technician.  Complaint (*Teed* Dkt. # 1), ¶¶ 2, 9.  Old JT Packard's technicians performed maintenance and emergency services at various customer sites throughout the country. *Id.*, ¶ 10.  They worked out of their home offices where they received assignments for scheduled maintenance, and they were required to monitor their cell phones for emergency dispatch.  *Id.*, ¶¶ 11-12.  The Complaint describes a variety of tasks that Teed performed at home, outside of his on-site scheduled and emergency maintenance work, including checking email, viewing a service calendar, calling customers, completing field service reports, and "other essential and ongoing office tasks."  *Id.*, ¶¶ 13-14.  Teed

---

[1]  The Complaint also alleges a state law wage claim pursuant to Wisconsin's overtime statutes, Sections 103.01, *et. seq.* and 109.01, *et seq.*  Although alleged on behalf of a statewide class of employees pursuant to Federal Rule 23, no such class has been certified.

[2] As briefly addressed below (and as more fully explained in TBPS's Brief in Opposition to Motion to Substitute Party (*Teed* Dkt. # 100)), TBPS acquired Old JT Packard's assets in receivership.  TBPS was later substituted in as a party to this litigation on November 23, 2010, pursuant to Federal Rule 25.  *See* Order (*Teed* Dkt. # 103).  "Old" JT Packard distinguishes the prior entity from "new" JT Packard, a business division of TBPS that currently provides uninterruptible power supply maintenance and repair services.

4

alleged that he received a fixed salary each week, but no overtime. *Id.*, ¶ 18. Alluding to (then) recent changes to the federal Motor Carrier Act, Teed implied that he was not exempt from coverage under the FLSA by virtue of the assertion of jurisdiction by the federal Secretary of Transportation. *Id.*, ¶¶ 16-17.

On September 16, 2008, the parties filed a Joint Stipulation Regarding Conditional Certification of Plaintiff's Fair Labor Standards Act Claims as a Collective Action. *See* Joint Stipulation (*Teed* Dkt. # 25). The parties stipulated to conditional certification of a class of Old JT Packard "Field Engineers," which would authorize mailing of court-approved notice and the opportunity to opt-in to the *Teed* case. Joint Stipulation, ¶ 4. The parties specifically agreed, however, that "Defendants have not waived their right or ability to petition the Court for decertification at the end of the discovery process – the second step." *Id.*

Following the issuance of court-approved notice, consent-to-join forms were filed on behalf of 25 field engineers, inclusive of the named Plaintiff, Teed. *See* Consents (*Teed* Dkt. ## 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 52). After the expiration of the deadline for the filing of consent forms on behalf of proposed party-plaintiffs in *Teed*, Plaintiff Marcus Clay initiated a second identical lawsuit, *Clay v. JT Packard & Associates, Inc.*, Case No. 3:09-cv-313 (W.D. Wis.), on May 19, 2009. Four additional consent-to-join forms were filed in *Clay*. *See* Consents (*Clay* Dkt. ## 2, 14).

As this litigation proceeded (and as has been extensively briefed to the Court), Old JT Packard and its parent corporation, Defendant S.R. Bray Corporation ("S.R. Bray"), were in extreme financial distress. *See generally*, Thomas & Betts Power Solutions,

LLC's Opposition to Plaintiffs' Motion to Join It as a Defendant (*Teed* Dkt. # 94), pp. 3-7. Ultimately, on October 29, 2009, the Court was advised that Old JT Packard would be sold to satisfy S.R. Bray's liabilities, leaving the Defendants with no assets. *Teed* Dkt. # 59. On January 18, 2010, Thomas & Betts Corporation, TBPS's parent, purchased Old JT Packard's assets at auction in receivership, pursuant to the terms of an Asset Purchase Agreement. *Teed* Dkt. # 94, pp. 7-8.

Plaintiffs filed their Motion to Substitute Party on August 19, 2010, under Federal Rule 25. Motion to Substitute (*Teed* Dkt. # 88). TBPS responded in opposition to Plaintiffs' Motion on September 3, 2010. Opposition Brief (*Teed* Dkt. # 100). The Court granted Plaintiffs' Motion on November 23, 2010, finding that TBPS could be held equitably liable for Old JT Packard's liabilities pursuant to a "federal standard for successor liability" because (1) TBPS had notice of the *Teed* and *Clay* claims in advance of the asset purchase, and (2) TPBS continued to operate Old JT Packard's business ("New JT Packard"). *See* Opinion and Order (*Teed* Dkt. # 103), p. 3. Plaintiffs have pursued their collective claims arising out of their employment with Old JT Packard against TBPS.

## II.   DISCOVERY REGARDING PLAINTIFF TEED AND CLAY'S CLAIMS AND THE CLAIMS OF THE OPT-IN PLAINTIFFS.

### A.   TBPS's Affirmative Discovery Efforts.

The Court issued its Preliminary Pretrial Conference Order on January 28, 2011, establishing a discovery cut-off date of November 15, 2011. Order (*Teed* Dkt. # 108). Relatively little discovery had been conducted prior to TBPS's substitution as a party-

defendant, due in significant part to the prior Defendants' financial circumstances.  *See*, *e.g.*, *Teed* Dkt. # 56.   Since the issuance of the most recent Preliminary Pretrial Conference Order in January 2011, TBPS has served written discovery on all thirty named and opt-in plaintiffs.  Lipschultz Decl., ¶ 10.  Only 17 of the 30 claimants have elected to respond, however.  *Id.*, ¶ 11.  TBPS also scheduled depositions of the named Plaintiffs, Teed and Clay, and a subset of the opt-in plaintiffs to determine the nature of their overtime claims.

The following claimants have not responded to any discovery; they have either refused to serve answers to written interrogatories or document requests, and/or they refused to cooperate with respect to the scheduling of depositions:

Robert Dabal

Thomas Daly

Andrew Fritscher

Keith Jackson

Michael McNamara

Darrick Nelson

Lewis Tate

Upon information and belief, claimants, Daly, Fritscher, and McNamara, are now deceased.  Lipschultz Decl., ¶ 12-13.

**B.    The Named Plaintiffs' Claims, and the Evidence They Offer on Behalf of "Similarly Situated" Field Engineers.**

As the Court noted in its Opinion and Order denying in substantial part Plaintiffs'

motion for partial summary judgment, the principle issues in dispute between the parties remain whether Plaintiffs (or any of the opt-in plaintiffs) worked hours in excess of the statutory threshold, and if so, how many overtime hours.  Opinion and Order (*Teed* Dkt. # 75).  Until September 2009, Old JT Packard's Field Engineers were salaried employees who did not receive overtime for hours worked in excess of 40 per week.  Response to Plaintiff's Proposed Findings of Fact (*Teed* Dkt. # 117), ¶ 7.  The parties do not dispute that Plaintiffs drove their vehicles as part of their employment, and as the Court has noted, such employees "were considered to be exempt from the overtime provisions of the FLSA."  Opinion and Order (*Teed* Dkt. # 75), p. 6.  With a change in the law in August 2005, many such employees lost their exempt status, including Old JT Packard's Field Engineers.  Plaintiffs' overtime claims, therefore, are focused on the time period between August 10, 2006,[3] until September 2009, when Old JT Packard reclassified them as non-exempt.

The parties do not dispute that Old JT Packard required Field Engineers to record the time they spent traveling to and from a customer location where they provided maintenance or emergency services, and to separately record their "labor," the time they spent working at a customer location.  Ptfs.' Proposed Findings of Fact (*Teed* Dkt. # 114), ¶¶ 42, 43.  This was, in fact, Plaintiffs' primary duty – providing maintenance and

---

[3]  Old JT Packard's human resources generalist has stated under oath that he was unaware of the change in the Motor Carrier Act in 2005 that impacted the exempt status of Old JT Packard's Field Engineers, and that he has no reason to believe that anyone at Old JT Packard was aware of this change in the law.  Neary Decl., ¶¶ 3-4 (Dkt. # 120).  Accordingly, TBPS is entitled to the safe harbor protections offered by the Technical Corrections Act, Pub. L. 110-224, § 306(b).

emergency services for customers that utilize uninterruptible power supply ("UPS") generator systems. Old JT Packard maintained data reflecting Field Engineer travel time and labor data on "Field Service Reports" ("FSRs"), and summary data compiled from the FSRs have been produced in discovery for Plaintiffs and the opt-in plaintiffs. Lipschulz Decl., ¶ 14; Exh. 9. Consistent with the nature of Field Engineers' "on-call" job responsibilities, the FSRs reflect a wide range in reported travel and working time for each Plaintiff and opt-in plaintiff on a week-to-week basis. *Id.*, Exh. 9. Field Engineers never worked a regular schedule; they were scheduled to respond to customer calls for maintenance or emergency service within their territory when and if a customer needed such assistance. The range in both reported travel and labor times reflects the extreme variability both in terms of the distance that a Field Engineer may travel to one or more customer locations in-state and out-of-state, as well as the time the Field Engineer may spend working on-site in order to resolve the mechanical or maintenance issues that prompted the service call.

Through their deposition testimony, Teed and Clay and the opt-in plaintiffs have compounded the complexity of the disputed issues raised in this litigation by categorically rejecting the accuracy of the FSRs as a reflection of hours worked. Old JT Packard's documented expectation, in fact, was that all client-related work activities would be accurately recorded in the FSRs. Sears Decl., ¶ 5 (*Teed* Dkt. # 121). Furthermore, beginning in mid-2007, Old JT Packard employed a new software program called FieldPlus that ultimately included specific areas where Field Engineers could separately record time spent engaged in administrative activities relating to client service,

technical support, and training. *Id.*, ¶¶ 6-7. Regardless, Plaintiffs have insisted that the FSRs are either utterly unreliable as a reflection of hours worked in *any* respect, or that they reflect *only* time actually spent in travel and on-site work activities. Plaintiffs insist that they should be compensated for a variety of activities performed at home, or separately from their maintenance or emergency assignments, including reviewing emails, conferencing with schedulers and other Field Engineers on "tech support" calls, viewing their service calendars, completing FSRs, maintaining tools, reviewing manuals, and purchasing or recycling batteries or other equipment, among other activities.

In order to establish a right to compensation for hours worked, Plaintiffs must present admissible evidence to the jury establishing a reasonable basis for the conclusion that they worked hours in excess of forty in any particular workweek, and that they were not compensated for those hours at a premium rate. Teed testified quite frankly that he has no way to reasonably estimate the hours that he actually worked, other than by reference to the hours recorded on the FSRs. Teed Dep., pp. 116, 183-84. At his deposition, Teed offered a "guesstimate" of 20 hours of "unrecorded" time per week on various work-related activities, *id.*, pp. 117, 184, but he admits that this is "just a number that [he] was picking out of the air." *Id.*, p. 183. He really has no idea how he can determine the amount he is owed – he has no idea how a jury could conceivably answer this question either. *Id.*, p. 192.

Teed further admits that his "guesstimate" of 20 hours of unrecorded hours only applies to weeks when he actually was assigned work, and there were certainly weeks that he had no work scheduled. Teed Dep., p. 125 ("So in those weeks when it comes to

doing paperwork, since I had no job, I can't justify and say, yeah, I did five, ten hours' worth of paperwork on a week where I had no job."). He admits that it would not surprise him if his FSRs reflected that on many weeks he only recorded 5, 10, or 15 hours of travel and on-site labor. *Id.*, p. 128. Indeed, contrary to his co-plaintiff, Clay, *see infra*, Teed actually credits the accuracy of the FSR reports, even in those weeks that reflect that he worked less than ten hours in a week. *Id.*, pp. 176, 180.

With respect to time spent in specific work-related activities at home (and therefore, not recorded on the FSRs), Teed testified that he checked his email five times a day when he had no work scheduled; on the two days per week he spent on the road, he would check his email twice a day. Teed Dep., pp. 78-79. He spent 15 to 45 minutes per day checking email, and ten minutes per day checking his calendar. *Id.*, pp., 80, 83, 85-6.

Teed traveled up and down the East Coast on assignments, Teed Dep., pp. 48-9, driving over 50,000 miles a year. *Id.*, p. 92. A typical work assignment would include seven hours of driving time. *Id.*, p. 93. Teed spent about ten minutes to load his car before leaving in the morning, and ten minutes to unload his vehicle when arriving home, *id.*, p. 86, but he only engaged in this activity on those days when he had scheduled or emergency assignments. *Id.*, pp. 88-9. His schedule changed constantly. *Id.*, p. 98. Consistent with his training, he tried to complete the FSRs on-site, at the customer location, as accurately as possible. *Id.*, pp. 55-6, 58-9.

Teed estimates he spent two hours per month reading manuals, Teed Dep., p. 107, and another hour per week picking up and dropping off parts. *Id.,* p. 111. When asked how he would compare his working time with other Field Engineers, he admits that he

11

cannot do so – it would be "comparing apples to oranges." *Id.*, p. 130. In general, it was his sense that there were other Field Engineers who performed "a lot more work" than he did. *Id.*, pp. 188-89; *see also id.*, p. 99.

Plaintiff Clay, by contrast, has far less faith in the FSRs as a reflection of his working time. Clay testified that he virtually never worked less than 40 hours in a week. *See* Clay Dep., pp. 102-3, 167. To the extent his FSRs reflect that his total customer on-site working and travel time amounted to fewer than 40 hours, Clay believes that the records should simply be adjusted to 40 hours, plus an additional ten hours of overtime. *Id.*, pp. 170-71. For example, on a week where his FSRs indicate he only worked 17 hours, Clay testified that 38 hours should be added to the total – because Clay flatly believes he is entitled to 10 to 15 hours of overtime every week. *Id.*, p. 166; *see also id.*, p. 173 (Clay testifies that he should receive ten hours of overtime, every week, "at minimum."). On the other hand, if the FSRs actually reflect that he worked more than 40 hours in a week, Clay accepts the FSRs as accurate. *Id.*, p. 171.

With respect to the working time that was not documented in the FSRs, Clay testified that "almost 100 percent" of his emergency visits (at least one per week) involved a second follow-up visit with the client, and he did not record any of this travel or on-site time on an FSR. Clay Dep., pp. 68-70. He also testified that he "volunteered" to assist other Field Engineers on their assignments "every week," and he would not complete an FSR for that time. *Id.*, pp. 72-73.

In contrast to Teed, Clay testified that he spent 30 minutes to an hour every morning reviewing email, *see* Clay Dep. p. 83, and an *additional* hour-and-a-half to two

hours "every day" on the telephone with various managers, schedulers, or customers.  *Id.*, pp. 86-9.  This time does not include other "tech support" calls at home, which could last two minutes, or four hours.  *Id.*, pp. 90, 93.  While Teed testified to spending two hours per month "reading manuals" relating to his work as a Field Technician, *see supra*, Clay testified that he spent up to <u>ten hours a week</u> engaged in such extracurricular, work-related "research."  *Id.*, pp. 110-11.  Clay never reported any of this administrative time to Old JT Packard on his FSR or in FieldPlus.  *Id.*, pp. 135-137.  Like Teed, he also has no knowledge regarding the hours worked by other Field Engineers.  *Id.*, p. 17.

## LEGAL ARGUMENT

## I.   THE STANDARD GOVERNING CERTIFICATION OF A COLLECTIVE ACTION FOR TRIAL.

By its statutory terms, the FLSA permits actions by "any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  *See, e.g.*, *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2010).  The statute does not describe the procedural tools that should be used to manage representative litigation, but the Supreme Court has authorized implementation of the FLSA's collective action mechanism by court-facilitated notice to potential plaintiffs in "appropriate cases" that allows potentially similarly situated claimants to file written consent to join the litigation.  *Hoffman-LaRoche v. Sperling*, 493 U.S. 165, 169 (1989).

This Court employs a two-step process for managing collective actions and ultimately determining whether the plaintiffs' claims can actually be tried collectively.  *See Sharpe v. APAC Customer Services, Inc.*, 2010 U.S. Dist. LEXIS 1671 (W.D. Wis.,

Jan. 11, 2010). At the first, or "lenient" stage, the plaintiffs need only make "a modest factual showing" that they are similarly situated to potential class members. *See Austin v. Cuna Mutual Insurance Society*, 232 F.R.D. 601, 605 (W.D. Wis. 2006). Here, in consideration of this lenient standard, Old JT Packard stipulated to notice. Now, at the close of discovery, however, the parties have reached the second stage of the two-step process. *Espenscheid v. DirectSat USA, LLC*, 2010 U.S. Dist. LEXIS 55578, *17 (W.D. Wis., June 4, 2010) ("*Espenscheid I*") ("The second step occurs at the close of discovery upon a motion for decertification from the defendant.").

At the second stage, the parties have typically conducted discovery regarding the claims at issue, and the court has more information upon which to base its decision as to whether the parties are truly similarly situated. For that reason, the court's inquiry is more stringent. *Pacheco v. Board's Head Provisions, Inc.*, 671 F. Supp.2d 957, 959 (W.D. Mich. 2009) ("a more rigorous standard" is applied at the second stage). Here, the Court must decide whether the named plaintiffs, Teed and Clay, are "similarly situated" to those individuals who have filed consent to join this litigation as "opt-in plaintiffs" pursuant to 29 U.S.C. § 216(b) with respect to their overtime claims. The Court of Appeals for the Seventh Circuit has not offered guidance regarding the meaning of "similarly situated" in this context, but this Court has considered (1) whether the factual and employment settings of the individual plaintiffs are similar or disparate; (2) whether defendants may assert various defenses that appear to be individual to each plaintiff; and (3) whether fairness and procedural considerations support proceeding as a collective action. *Espenscheid v. DirectSat USA, LLC*, 2011 U.S. Dist. LEXIS 56062, *14 (W.D.

Wis., May 23, 2011) ("*Espenscheid III*") (citing *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)).  *See also Espenscheid v. DirectSat USA, LLC*, Case No. 09-cv-625-bbc, Opinion and Order, pp. 21-22 (Dkt. # 387) (W.D. Wis., February 10, 2011) ("*Espenscheid II*") (applying these factors to determine whether field technicians are similarly situated).

Although TBPS has prompted this inquiry by motion, "the burden remains on the plaintiffs to establish that the individual class members are similarly situated." *Espenscheid II*, Opinion and Order, p. 21 (Dkt. # 387) (citing *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008)).  Although this case has been pending for several years, this Court has recognized that "[e]ven on the eve of trial," district courts are "charged with the duty of monitoring [their] class decisions in light of the evidentiary development of the case.  The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."  *Espenscheid III*, 2011 U.S. Dist. LEXIS 56062, *13 (quoting *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983)).

TBPS anticipates Plaintiffs' argument that the Court already certified this case as a collective action for the purpose of trial in March 2009 by virtue of Old JT Packard's failure to move to decertify the conditionally certified claims, consistent with earlier pretrial deadlines, before TBPS was substituted into this lawsuit.  *See* Memorandum (*Teed* Dkt. # 55) (noting that "plaintiff has waived his right to certify a state law class for violations of Wisconsin's overtime laws and defendants have waived their right to decertify the FLSA class.").  Initially, TBPS notes that Old JT Packard's ability to

prosecute its defense in 2009 was obviously impacted by its financial distress. TBPS was not a party to this litigation at the time, and having been joined to this litigation unwillingly by operation of an "equitable" common law federal rule, it would be highly *inequitable* and extremely prejudicial to hold TBPS responsible for Old JT Packard's failure to meet certain scheduling deadlines when it was struggling to survive as an ongoing business concern.[4]    Furthermore, as this Court has also noted, permitting a collective action to proceed to trial when the claimants are not truly "similarly situated" is "fundamentally unfair to *both* sides." *Espenscheid III*, 2011 U.S. Dist. LEXIS 56062, *23 (italics added, quoting *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp.2d 567, 588 (E.D. La. 2008)).  By the inaction of a presumed predecessor corporation, TBPS could not conceivably "waive" the rights of absent class members to have their individual claims heard if they are not similarly situated to the purported "representative plaintiffs."

More significantly, this Court has recognized that it has an independent obligation to ensure that the procedural mechanisms that facilitate representative actions, whether those are divined within Section 216(b) of the FLSA or Rule 23, are used only in appropriate cases.  Decertification of a class or collective action is appropriate "at any

---

[4]  Such circumstances would clearly meet the "good cause" requirement set forth in Rule 16 that would justify an amendment to the pretrial scheduling order and permit TBPS's motion, which consistent with this Court's "two stage" approach to collective actions under Section 216(b), should typically be filed at the close of discovery. *See* Fed. R. Civ. P. 16(b)(4) (permitting the modification of a pretrial schedule for "good cause").  The "good cause" standard considers the diligence of the party seeking the amendment, *see Trustmark Ins. Co. v. Gen & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005), and here, TBPS has requested the Court's consideration of the issue at the close of the discovery period, the point in time that this Court deems such motions appropriate.

time during the course of the litigation" if the court deems that the issues raised by the parties cannot be appropriately resolved on the basis of representational evidence, consistent with the purpose of proceeding collectively. *Espenscheid III*, 2011 U.S. Dist. LEXIS, *13 (quoting *Walker v. Bankers Life & Casualty Co.*, 2008 U.S. Dist. LEXIS 60593 (N.D. Ill., July 28, 2008)). Here, now that discovery is complete, there is simply no conceivable basis upon which the key factual issues disputed by the parties can be resolved based upon representational evidence, which is the touchstone of a collective action at trial.

## II. DISCOVERY HAS ESTABLISHED THE DISPARATE EMPLOYMENT CIRCUMSTANCES OF ALL MEMBERS OF THE PUTATIVE CLASS.

### A. This Court's Application of the "Similarly Situated" Standard in *Espenscheid III*.

TBPS brings this motion in reliance upon this Court's application of the legal standard to extraordinarily similar facts in *Espenscheid III*. In that case, the "[p]laintiffs' theory of liability was that the defendants' nationwide piece-rate compensation policy pays technicians only for the time they spend completing installations and fails to compensate technicians for nonproductive activities. Also, plaintiffs contend that under defendants' policy, technicians were encouraged to under report their hours spent working and as a result, technicians were not paid overtime for hours worked in excess of 40 hours a week."[5] *Espenscheid I*, 2010 U.S. Dist. LEXIS 55578, *18. A number of

---

[5]   These claims are remarkably similar to Plaintiffs' claims arising out of their employment with Old JT Packard. They allege that they were paid a fixed salary, similar to a piece rate, for all hours worked, and that they did not record the time engaged in "nonproductive" (*i.e.*, non-client related) work at home.

technicians submitted declarations stating that they had similar job duties, they were compensated in the same way, and they all performed "uncompensated nonproductive and productive work[.]" *Id.*, *18. The Court acknowledged the defendant's arguments regarding the individualized nature of the plaintiffs' claims, and that "each technician spent varying amounts of time performing nonproductive tasks[,]" but the Court "rejected the notion that individualized differences preclude conditional certification at this early stage of the analysis." *Id.*, **22-3 (citing *Sharpe*, 2010 U.S. Dist. LEXIS 1671 ("[A]rguments regarding similar situation, individual issues and manageability of a nationwide class will become relevant at the second stage[.]")).

At the second stage, however, the Court was compelled to consider the individual employment circumstances of the plaintiffs and opt-in plaintiffs, ultimately concluding that the claims could not be tried on a representational basis, consistent with due process. *Espenscheid III*, 2011 U.S. Dist. LEXIS 56032, **22-23. "The idea behind representative proof is that plaintiffs could provide testimony from a sample of technicians who can provide detail information regarding their experiences, which can be extrapolated to the remainder of the group without significant error." *Id.* The discovery record in *Espenscheid*, however, revealed several complicating factors which convinced the Court that the claims could not be tried collectively. For example, "the quantity of work available to technicians varied according to time and location." *Id.*, **18-19. This "wide variability in weekly hours worked implie[d] strongly that one technician's experiences may not be a proxy for others." *Id.*, *19. The Court also noted the varying distances cited by the plaintiff-technicians to drive to their first customer job, and the

varying amounts of time that declarants stated that it took to perform various tasks. *Id.*

"Given the wide variability and inconsistencies in technician testimony," the Court concluded that "it would be difficult for a jury to determine what experiences are representative of the entire group of technicians at issue in this case without gross margins of error." *Id.* Trying the case on a representational basis would also deprive the defendant of its right to cross-examine individual technicians regarding the credibility of testimony describing the time they allegedly spent performing non-productive tasks at home. *Id.* The defendant's affirmative defense to liability for driving time under the Portal-to-Portal Act would also depend on each claimant's testimony, and the application of the continuous workday doctrine. *Id.* Quoting *Johnson v. Big Lots Stores*, this Court agreed that "collective treatment is not appropriate where a defendant would be required to 'pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs to prove' their defenses." *Id.* (quoting 561 F. Supp.2d at 586). In *Espenscheid*, the Court concluded that trying the plaintiffs' claims collectively would be "fundamentally unfair to *both* sides." *Espenscheid III*, 2011 U.S. Dist. LEXIS 56062, *23 (italics added).

> **B.    Plaintiffs' Deposition Testimony, as Contrasted with the Opt-in Plaintiffs, Establishes Extraordinarily Diverse Work Experiences.**

The claimants in this case share many of the same varied experiences that the Court noted as dispositive in *Espenscheid* on the question of whether such claims for uncompensated work can be tried on a representational basis. The core issue at trial will be the number of hours Field Engineers engaged in work-related activities. More

specifically, the parties dispute whether and to what extent Field Engineers were engaged in compensable work-related activity that is not reflected on the FSRs, and the answer to that question depends in part on when the activities occurred. If such activities occurred during "travel" or "site" time as reflected on the FSR, then by definition they are encompassed within the time reflected on the FSR, because such time starts the moment the Field Engineer leaves his house, and encompasses all time spent traveling to the site, on the site, until the Field Engineer arrives home. Kehrmeyer Dep., pp. 27-28; Perry Dep., pp. 81-82.

A review of the FSR data, standing alone, certainly reveals that there is no such thing as a "standard workweek" in the life of a Field Engineer. *See* Lipschultz Decl., Exh. 9. Both the labor and travel hours reported by Teed and Clay, as well as every opt-in plaintiff, varied dramatically – from one to two hours a week to more than sixty hours. *Id.* This is consistent with the nature of Field Engineers' primary duty – providing both scheduled maintenance and "on-call" emergency repair services for customers in the field. Their schedules changed constantly, Teed Dep., p. 98, and no Field Engineer worked the same routes or serviced the same customers.

Other opt-in deposition testimony likewise highlights the wide disparity in testimony on issues critical to resolution of the claims in this case. Opt-ins Henry Chau, Tim Hershey and Michael Kehrmeyer testified that they almost never completed their FSRs while at the client site, but Plaintiff Clay and opt-in Perry testified that they primarily did complete such paperwork on site. Chau Dep., pp. 49-50; Kehrmeyer Dep., p. 42; Hershey Dep., p. 50; Clay Dep., pp. 56-58; Perry Dep., pp. 61-62. Old JT Packard

20

expected the Field Engineers to complete this paperwork on-site, but clearly at least some portion of the opt-in class are seeking a substantial amount of time engaging in this work-related activity at home.

The claimants offer a wide variety of estimates concerning the time they spent engaged in "tech support," or conferring with other Field Engineers regarding maintenance or repair questions. Opt-in Chau testified that, with the exception of "hard" tech support calls he dealt with at home once a month, he generally provided tech support while traveling to or from a customer site, and therefore, during time encompassed on the FSR. Chau Dep., pp. 45-47, 53. In contrast, Clay testified that he *only* provided tech support while at home. Clay Dep., pp. 90-93. Opt-in Kehrmeyer testified that 75% of the time he provided tech support to fellow Field Engineers either while on-site or during FSR-recorded travel time. Kehrmeyer Dep., pp. 39-40.

In addition to disparate testimony regarding where and when such work was conducted, the testimony as to the amount of time spent in tech support varied dramatically from claimant to claimant. For example, opt-in Kraft testified he spent 20-30 hours per week performing tech support -- his phone "never stopped ringing" at all hours of the day and night. Kraft Dep., pp. 45-46, 157. Kraft should not be permitted to testify as a representative plaintiff, where other plaintiffs testified that they spent between 30 minutes and 2 hours a week on such activities. *See, e.g.,* Olivas Dep., p. 81; Clay Dep., p. 93. Opt-in Hershey, for his part, "wouldn't want to guess" on how much time he spent providing tech support in an average week. Hershey Dep., p. 47.

Claimants testified to widely disparate practices with respect to loading and

unloading their vehicles, a factual issue that will have a significant impact on TBPS's Portal-to-Portal defense.    Opt-in Henry Chau denied spending <u>any</u> time loading/unloading tools in connection with his jobs because his equipment stayed "in his trunk the whole time" (Chau Dep., pp. 42-43), opt-in Kehrmeyer estimated he spent 10-15 minutes loading tools and equipment into and out of his vehicle (Kerhmeyer Dep., pp. 35-36); and opt-in Kraft said he spent an hour doing so.  Kraft Dep., pp. 80-81.

Virtually every activity that one claimant alleges to have performed in a time or place that was not recorded on an FSR, another claimant testified that he either did not perform that task – or he spent dramatically less or dramatically more time engaged in that activity.  Clay claimed that he spent at least six to ten hours per week at home reading manuals relating to UPS equipment (Clay Dep., pp. 109-11), but opt-in Chau only engaged in such activity once a month (Chau Dep., pp. 46-47, 53) and opt-in Hershey estimates only 2-3 times per month.  Hershey Dep., p. 55.  Opt-in Chau testified that 85% of the time, parts and equipment were shipped to his home or the customer site directly (Chau Dep., pp. 64-65), and opt-in Hershey testified that "nine times out of ten" he made such trips as part of trips to/from client sites (*i.e.*, during "travel time").  Hershey Dep., p. 58.  Clay testified to the exact opposite:  90% of the time he made separate stand-alone trips to pick up or drop off parts that were not associated with any specific travel to or from a job site.  Clay Dep., pp. 37-38.  Clay asserted that he spent one hour bi-weekly shopping for air filters to use on the job, never in connection with any client site visit.  *Id.*, p. 140.  Opt-in Hershey testified that he only performed such errands in connection with "site time" that he recorded in his FSR.  Hershey Dep., pp. 66-68.  Opt-

in Chau picked up air filters on his own time while shopping for personal items, and he is not alleging Old JT Packard should compensate him for that time. Chau Dep., p. 70. None of these claimants is qualified to testify regarding the experience of any other. *See*, *e.g.*, Teed Dep., p. 130 (comparing Field Engineers working hours is like "comparing apples to oranges").

      **C.**    **Consistent with Due Process, TBPS Must Be Entitled to Cross-Examine Each Claimant.**

It is long settled that a representative action is "an exception to the usual rule that litigation is by and on behalf of the individual named parties only." *General Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). The principle purpose of devices such as Rule 23 or the collective action mechanism under Section 216(b) is to advance "the efficiency and economy of litigation," and a representative action serves that purpose only when plaintiffs show that the issues involved in their claims "are common to the class as a whole" *and* that those issues "turn on questions of law applicable in the same manner to *each* member of the class." *General Tel. Co.*, 457 U.S. at 155, 159 (internal quotations omitted, emphasis added). Although this case is styled as a collective action, and not a traditional class action under Rule 23, this Court has recognized the similar purpose that underlies each case management tool. *See Ruiz v. Serco, Inc.*, 2011 U.S. Dist. LEXIS 91215 (W.D. Wis., August 5, 2011) (denying conditional certification in a misclassification case, citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), as "instructive."). *See also MacGregor v. Farmers Ins. Exchange*, 2011 U.S. Dist. LEXIS 80361 (D.S.C., July 22,

2011) (citing *Dukes*, denying conditional certification under Section 216(b) of a proposed class of employees who claimed unpaid compensation for missed meal breaks, training classes, and time spent filing timecards or expense reports).

Here, there are no "common answers" to be derived from the claimants' proposed evidence in response to the central "common question" at issue: whether and to what extent each claimant worked hours in excess of the statutory threshold, such that he is entitled to an overtime premium. *See Dukes*, 131 S. Ct. at 2551 ("What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."). Instead, TBPS is entitled to cross-examine each Plaintiff and opt-in plaintiff concerning whether he credits the FSR report – or not; whether he performed any of the various tasks that the claimants have described in their pleadings, discovery responses, and depositions as "unreported work"; how much time was spent on such tasks on a week-to-week basis; whether such time was reasonably "suffered or permitted" by Old JT Packard so as to qualify as "work" under the FLSA; and with respect to certain activities, when those tasks were performed. For example, TBPS is entitled to argue – and prove -- that at least some portion of the time spent engaged in travel would not qualify as working time because the Field Engineers were commuting to their first assignment of the day. *See Rutti v. Lojack Corp.*, 596 F.3d 1046, 1060 (9th Cir. 2010) (citing 29 C.F.R. § 785.16). If the testimony of these claimants is credited, there is simply no "common answer" to the question presented by this affirmative defense to liability. *See Espenscheid III*, 2011 U.S. Dist. LEXIS 56062, *21 (acknowledging this

defense as justification to decertify a collective action).

TBPS recognizes that this case does not present a proposed class of *Espenscheid's* size and scope. The due process concerns that must be addressed here, however, cannot be evaluated in consideration of the number of potential parties that would be deprived of their separate and individual right to a fair civil trial. If the case proceeds as a collective action, the jury would necessarily rule "on the basis of proof that is not representative of the *whole class*," whether that class numbers in the thousands or less than 50. *Espenscheid III*, 2011 U.S. Dist. LEXIS 56062, *23 (italics added). Collective actions present an opportunity for an "all or nothing" resolution of the claims of "similarly situated" employees. *Id.* If the claimants truly are not similarly situated – and here, there is absolutely no conceivable argument that Teed and Clay are similarly situated to one another, let alone the other Field Engineers who joined this case as opt-in plaintiffs -- "the case must be decertified." *Id.*

**D.  Those Opt-In Plaintiffs Who Have Failed or Refused to Participate in Discovery Should Be Dismissed.**

By filing consent to join this litigation under 29 U.S.C. § 216(b), each opt-in plaintiff agreed to assume certain responsibilities as a "party plaintiff" in this litigation. *Id.* Seven of the opt-ins have failed or refused to cooperate in any discovery whatsoever. District courts have dismissed opt-in plaintiffs for failing to participate in discovery. *See Doornbos v. Pilot Travel Centers, LLC*, 2008 WL 4764334, *2-3 (E.D. Tenn., Oct. 27, 2008) (dismissing twenty-six opt-in plaintiffs from a FLSA collective action for failure to appear at their depositions); *Williams v. Le Chaperon Rouge*, 2008 WL 2074039, *1-2

(N.D. Ohio, May 14, 2008) (dismissing four opt-in plaintiffs from a FLSA collective action for failure to participate).  *See also Lenora v. Koller Die & Tool Co., Inc.*, 1978 WL 200, *1 (E.D. Wis., July 31, 1978) (invoking Fed. R. Civ. P. 37(d) in dismissing claims of named plaintiff in a class action for twice failing to appear at his deposition, and simultaneously denying his motion for class certification).

To the extent that this Court deems that this case should proceed as a collective action, TBPS should not be held liable to opt-in plaintiffs who refuse discovery regarding the nature and scope of their claims.   Accordingly, opt-in plaintiffs Daly, Fritscher, Jackson, McNamara, Dabal, Nelson, and Tate should be dismissed.

## CONCLUSION

For the reasons set forth above, this case should be decertified, the opt-in plaintiffs should be dismissed, and the case should proceed to trial on the claims asserted by the two named plaintiffs, Teed and Clay.

Dated this 7th day of December, 2011.

s/ Andrew J. Voss
Noah G. Lipschultz  (MN SBN: 0387308)
nlipschultz@littler.com
Andrew J. Voss  (MN SBN: 0241556)
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000
Facsimile:  612.630.9626

**ATTORNEYS FOR DEFENDANT**

Firmwide:105105130.1 052857.1006